UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SCOTT A. LOEHNDORF, | CASE NO. C14-0106JLR |
| Plaintiff, | ORDER GRANTING MOTION TO DISMISS |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

Before the court are two motions:  (1) Plaintiff Scott Loehndorf's motion challenging the government's scope-of-employment certification (Pltf. Mot. (Dkt. # 9)); and (2) Defendant United States of America's motion to dismiss (Mot. to Dismiss (Dkt. # 13)).  The court has considered both motions, the governing law, the record, and all submissions supporting and opposing the motions.  Considering itself fully advised, the court DENIES Mr. Loehndorf's motion, GRANTS the United States' motion, and dismisses this case.

ORDER- 1

## I.    INTRODUCTION

1

2        This is a defamation case set aboard the U.S.S. Nimitz, a nuclear-powered aircraft

3   carrier that is one of the largest warships in the world.  At the time of the alleged

4   defamation, both Mr. Loehndorf and Ms. Williams were active members of the United

5   States Navy serving aboard the U.S.S. Nimitz.  (*See* Compl. (Dkt. # 1-2) ¶¶ 3.2-3.3.)

6   Plaintiff Scott Loehndorf was Damage Controlman First-Class, and Ms. Williams was

7   Damage Controlman Third-Class.  (*Id.*)  Mr. Loehndorf was Ms. Williams' direct-line

8   supervisor.  (*Id.* ¶ 3.4.)

9        While serving aboard the U.S.S. Nimitz, Ms. Williams was allegedly carrying on

10  an adulterous relationship with another Damage Controlman named Wesley Myers.  (*Id.*

11  ¶ 3.5.)  The alleged relationship violated military rules and became the subject of an

12  investigation.  (*Id.* ¶¶ 3.5-3.7.)  As part of the investigation, Mr. Loehndorf, as Ms.

13  Williams' commanding officer, was asked to provide command with a sworn statement

14  regarding the relationship.  (*Id.* ¶ 3.8.)  He did so.  (*Id.*)  In the statement, he indicated

15  that there was a perception of fraternization between Ms. Williams and Mr. Myers.  (*Id.*)

16       Mr. Loehndorf alleges that Ms. Williams then retaliated against him for this

17  statement.  After the statement was made, Ms. Williams made an informal complaint of

18  sexual harassment against Mr. Loehndorf, which was resolved informally.  (*Id.* ¶ 3.11.)

19  She revived her complaint roughly three months after that, claiming that Mr. Loehndorf

20  "continued to touch her inappropriately and violate her boundaries."  (*Id.* ¶ 3.13.)  She

21  eventually filed a formal sexual harassment complaint, alleging that Mr. Loehndorf had

22  sexually harassed her on more than one occasion.  (*Id.* ¶¶ 3.14-3.16.)

1    Mr. Loehndorf brought this action against Ms. Williams in King County Superior

2 Court.  He alleges that Ms. Williams' sexual harassment allegations were false, and that

3 she made them "intentionally, willfully and with malicious intent." (*Id.* ¶¶ 4.2-4.4.) He

4 also claims that she fabricated the allegations for the purpose of distracting the ship's

5 commanding officers from her own investigation. (*See id.*) He asserts claims for

6 defamation, false light, and negligent and intentional infliction of emotional distress. (*Id.*

7 ¶¶ 4.1-7.4.) He claims that he was denied a promotion because of the sexual harassment

8 allegations. (*Id.* ¶¶ 3.9-3.10, 8.1-8.2.) As damages, he claims he suffered wage loss,

9 emotional distress, and damage to his career. (*See id.*)

10    Ms. Williams removed the case to federal court. (Not. of Removal (Dkt. # 1).)

11 The United States substituted itself as sole defendant pursuant to the Westfall Act, 28

12 U.S.C. § 2679. (Not. of Substitution (Dkt. # 2).) At that point, Ms. Williams ceased to

13 be a defendant in this action. (*See id.*)

14    Motions soon followed. On February 10, 2014, Mr. Loehndorf filed a motion

15 challenging the government's position that Ms. Williams was acting in the scope of her

16 employment. (Pltf. Mot.) On March 3, 2014, the United States filed a motion to dismiss

17 Plaintiff's complaint. (Mot. to Dismiss.) The court heard oral argument on the motions

18 on April 21, 2014, and conducted an evidentiary hearing on July 22, 2014. (4/21/14 Min.

19 Order (Dkt. # 22); 7/22/14 Min. Entry (Dkt. # 27).) Both Mr. Loehndorf and Ms.

20 Williams testified at the hearing. (7/22/14 Min. Entry.)

21

22

# II.    ANALYSIS

**A.    Governing Law Under the Westfall Act**

This case is governed by the Westfall Act.  The Westfall Act creates a species of tort immunity for federal employees acting within the scope of their office or employment.  *See, e.g.*, *Osborne v. Haley*, 549 U.S. 225, 245-47 (2007).  As described above, the immunity takes effect through the substitution of the United States as the named defendant in a pending tort action.  *See id.*  Under the Westfall Act, an action against a federal employee must be deemed an action against the United States if the federal employee was acting "within the scope of his office or employment" at the time of the alleged conduct.  *See* 28 U.S.C. § 2679(d)(1).  When the Act applies, the Attorney General can certify that the defendant-employee was acting in the scope of his or her employment, at which time the United States is substituted as the sole defendant in the case:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

*Id.*; *Pauly v. U.S. Dep't of Agric.*, 348 F.3d 1143, 1150-51 (9th Cir. 2003) (citing 28 U.S.C. § 2679(d)(1)).  This happened here.  Shortly after removal, the Attorney General certified that Ms. Williams was acting in the scope of employment with respect to the allegations in Mr. Loehndorf's complaint.  (*See* Not. of Substitution at 3 (certification of

1   Annette Hayes).)  Accordingly, and pursuant to the Westfall Act, the court substituted the

2   United States as the sole defendant in this case.  (1/27/14 Order (Dkt. # 5).)

3        Mr. Loehndorf has challenged the government's certification, as he has a right to

4   do.  *See Pauly*, 348 F.3d at 1150-51.  Upon a challenge, Mr. Loehndorf has the burden of

5   proving that the conduct underlying the tort claim occurred outside the scope of Ms.

6   Williams' employment.  *See id.*  Following a challenge, state law governs the scope-of-

7   employment inquiry under the Westfall Act.  *Id.* at 1151 (citing *McLachlan v. Bell*, 261

8   F.3d 908, 911 (9th Cir. 2001)).  "Under Washington law, an employee acts within the

9   scope of his employment, even if his acts are contrary to instructions or constitute

10  intentional torts, when he is 'engaged in the performance of the duties required of him by

11  his contract of employment' or when 'he [is] engaged at the time in the furtherance of the

12  employer's interest.'"  *Id.* (citing *Dickinson v. Edwards*, 716 P.2d 814, 819 (Wash.

13  1986)).

14       From a procedural standpoint, this case is governed by the Supreme Court's

15  decision in *Osborne*, 549 U.S. 225.  In *Osborne*, the Supreme Court addressed what a

16  district court should do in the atypical situation where the government certifies that the

17  alleged tortious acts were within the scope of employment by simply denying that the

18  acts ever occurred.  *See id.* at 246-47.  In a more typical case, the alleged tort might be,

19  for example, an automobile accident.  *See id.* at 251 n.15.  In an automobile accident

20  case, the government can ordinarily make a scope of employment determination without

21  accepting or denying the critical allegations in the complaint—for example, that the

22  employee acted negligently.  *See id.*  This case, like *Osborne*, presents a different set of

1    facts.  Here, the government denies the allegations in the complaint—specifically, the

2    allegation that Ms. Williams fabricated her sexual harassment claims.  (*See* Mot. to

3    Dismiss at 9-11.)  Moreover, the government's certification is premised on this denial.

4    (*See id.*)  This is the precise situation addressed in *Osborne.  See* 549 U.S. at 245-47.

5    Accordingly, the procedure outlined in *Osborne* is the correct procedure here as well.

6         Put simply, the *Osborne* procedure requires the court to resolve material factual

7    disputes.  *Id.* at 248-252.  Under *Osborne*, the court is required to resolve facts necessary

8    to determining whether the substitution was proper.  *Id.*  Here, that means the court must

9    make a factual determination about whether Ms. Williams' conduct was within the scope

10   of her employment aboard the U.S.S. Nimitz.  As the court in *Osborne* pointed out, this

11   determination must be made even if the factual dispute in question "goes to the heart of

12   the merits," and even if finding certain facts might jeopardize an eventual jury trial.  *Id.* at

13   251-53.

14        In this case, that means examining whether Ms. Williams fabricated her sexual

15   harassment allegations.  If she did not, certification is proper because Ms. Williams

16   would have had a duty to report Mr. Loehndorf's conduct to her supervisors:  Article

17   1137 of the U.S. Navy Regulations required her to report to a superior immediately upon

18   learning of behavior constituting sexual harassment.  (*See* Ruth Decl. (Dkt. # 14) at 12.)

19   Thus, under Washington law, if there was behavior constituting sexual harassment or if

20   Ms. Williams reasonable perceived that there was, Ms. Williams' conduct was within the

21   scope of her employment.  *See Pauly*, 348 F.3d at 1151.  On the other hand, if Ms.

22   Williams fabricated the allegations, as Mr. Loehndorf alleges, her actions were outside

1  the scope of her employment.  In that scenario, Ms. Williams would have had no duty to

2  report to her supervisors, and would have been acting purely in her own self-interest.  *See*

3  *id*.  If this were the case, certification would be improper.

4        Problematically, deciding this question requires examining issues that go to "the

5  heart of the merits" of this case.  *See Osborne*, 549 U.S. at 251-53.  Specifically, the court

6  must examine whether Ms. Williams fabricated her sexual harassment allegations.  This

7  is similar to the inquiry a jury would be required to make to decide Mr. Loehndorf's

8  defamation claim and related claims.  Nevertheless, *Osborne* requires the court to make

9  this determination even if doing so would eventually deprive Mr. Loehndorf of his right

10  to a jury trial.  *See id*.

11  **B.**  **Evidentiary Hearing**

12        In light of this state of affairs, the court held an evidentiary hearing.  (*See* 7/22/14

13  Min. Entry.)  Evidentiary hearings are mandatory in some circuits in this situation.  *See*

14  *Heuton v. Anderson*, 75 F.3d 357 (8th Cir. 1996).  Although the Ninth Circuit arguably

15  does not require a hearing, it is clear that evidentiary hearings are favored to resolve

16  disputed facts related to Westfall Act immunity.  *See Arthur v. U.S. ex rel. Veterans*

17  *Admin.*, 45 F.3d 292, 295 (9th Cir. 1995) ("[W]here disputed issues of fact exist relevant

18  to immunity, summary judgment will not be appropriate until the district court has held

19  an evidentiary hearing and resolved the disputes by formal findings."); *Lowery v.*

20  *Reinhardt*, No. Civ. S-07-0880 RRB DAD, 2008 WL 550083, at *4 (E.D. Cal. Feb. 27,

21  2008).

22

The evidentiary hearing was limited in scope.  This limitation was necessary to avoid any complications regarding active-duty naval officers.[1]  The parties filed a substantial amount of documentary evidence in this case.  All of that evidence was part of the record prior to the evidentiary hearing.  Accordingly, the court heard testimony from only Mr. Loehndorf and Ms. Williams at the hearing.  No other witnesses were permitted to testify.

**C.    Findings From Evidentiary Hearing**

1.  The testimony of both Mr. Loehndorf and Ms. Williams was largely consistent with the documentary evidence presented.  Neither party presented testimony that was greatly at odds with the documentary evidence.  Both parties' testimony was largely consistent with each parties' previously-presented version of events.

2.  Mr. Loehndorf was not entirely credible.  In part, this is due to omissions from his testimony.  Mr. Loehndorf never addressed most of the specific events underlying Ms. Williams' sexual harassment allegations.  He never explained any of the alleged behavior or addressed the events at the heart of the case.  Instead, he simply testified that he "never" sexually harassed Ms. Williams, "never" touched her in a sexual way, and "did not" make any lewd or otherwise suggestive comments to her.  (Ev. Hearing Tr. at 59-60.)  In addition, Mr. Loehndorf made an "apology" for certain of the alleged acts and pleaded guilty to certain charges of sexual harassment at a non-judicial punishment proceeding called a "captain's mast."  (*Id.* at 60-63.)  His attempts to explain his apology and guilty plea were not satisfactory and damaged his credibility with the court.  (*Id.*; *id.* at 66-71.)  Further, Mr. Loehndorf's testimony was at times contradicted by documentary evidence, further damaging his credibility.  (*Id.* at 66, 86-88.)  Mr. Loehndorf admits that he violated an order to stay out of damage control spaces, and that this violation formed the basis for one of his sexual harassment charges.  (*Id.* at 74-80.)  His

---

[1] At oral argument, counsel for Mr. Loehndorf represented that she could put on her case without calling any active members of the Navy.  Be that as it may, that would not have guaranteed that the United States could put on an effective rebuttal case without doing the same.  Thus, the court restricted the scope of the evidentiary hearing given the unique circumstances of the case and the substantial amount of evidence that was already in the record.

efforts to explain these incidents were not satisfactory and further damaged his credibility with the court. (*Id.* at 101-03.)

3. Ms. Williams was not completely credible either. For example, she testified that her relationship with Mr. Myers did not begin until December, 2013. However, this testimony appears to be contradicted by documentary evidence in the record, which suggests her relationship with Mr. Myers may have begun earlier. (Ev. Hearing Tr. at 33-36; *see also* Goeller Decl. (Dkt. # 10) at 4, 7, 10.) And while it is not necessary for the court to make a specific finding with respect to the truth of this fact, Ms. Williams' testimony on this topic, and her unsatisfactory attempt to explain the apparent inconsistency, damaged her credibility with the court. (*Id.* at 33-37.) On the other hand, much of Ms. Williams' testimony was forthright and credible, especially her testimony with respect to life aboard the Nimitz, her relationships with other sailors, and her interactions with Mr. Loehndorf.

4. In general, the witness' testimony was consistent when it came to the basic facts and chronology of events that form the basis of this action. The parties' testimony mostly differed with respect to interpretation of those events. Ms. Williams maintained that she felt sexually harassed and reported Mr. Loehndorf's behavior because she felt uncomfortable around Mr. Loehndorf. On the other hand, Mr. Loehndorf testified that he never sexually harassed Ms. Williams. This is consistent with the positions taken in the parties' briefing.

5. Ms. Williams first brought Mr. Loehndorf's behavior to the attention of her superiors in April, 2012.

6. Ms. Williams made an informal complaint of sexual harassment against Mr. Loehndorf in July, 2012. Ms. Williams' allegations were based on a series of events that she perceived as sexual harassment. Ms. Williams alleged that, in one such event, Mr. Loehndorf, who was drunk at the time, told Ms. Williams he wanted to "smack [her] ass" and attempted to put his head on her shoulder. (*Id.* at 20.) Ms. Williams also testified that there were incidents where Mr. Loehndorf would touch her elbow, arm, and back after being told that such touching was unwelcome. (*Id.*) She testified that he would touch her back "slow and soft" and that she told him "numerous times" that she did not like it and the touching would nevertheless continue. (*Id.* at 20-21.) Ms. Williams also testified that there was an incident in which Mr. Loehndorf put a plastic wad of trash in her coveralls. (*Id.* at 20.) All of this allegedly occurred during the period of time when Mr. Loehndorf was Ms. Williams' supervisor. (*Id.* at 21.) Due at least in part to the events described above, Ms. Williams testified that she felt "uncomfortable and awkward." (*Id.* at 20.)

7. As a result of Ms. Williams' initial informal complaint, Mr. Loehndorf was

placed on restrictions regarding Ms. Williams in July 2012. (*Id.* at 22.) He
was not allowed to be in her presence unless there was another male in the
vicinity. (*Id.*) He was not allowed to talk to her unless certain other conditions
were met, and he was not allowed to be her supervisor. (*Id.*) Ms. Williams
testified that Mr. Loehndorf violated these restrictions in numerous ways and
also continued to touch her. (*Id.* at 23-24.) She also testified that she received
a phone call from Mr. Loehndorf saying that he had called a wrong number but
that "it was really good to hear" her voice. (*Id.* at 24.)

8. Ms. Williams testified that these events, among others, led her to file a formal
   sexual harassment complaint in November 2012 because she was "fed up" that
   the informal resolution "wasn't working." (*Id.* at 25.) She testified that she
   was "feeling uncomfortable and . . . hated working there now." (*Id.*)

9. In "early 2012," Mr. Loehndorf gave a statement to command regarding an
   alleged relationship between Ms. Williams and Mr. Myers. (*Id.* at 53-54.) He
   stated that there was a perception among the sailors that Ms. Williams and Mr.
   Myers were involved in a romantic relationship. (*Id.* at 53-56.)

10. Mr. Loehndorf testified that he understood sexual harassment is "in the eye of
    the beholder." (*Id.* at 89.) He also testified that he understood that if he were
    put on notice that a subordinate woman did not want to be touched by him, it
    would be inappropriate to touch her. (*Id.*) He testified that the U.S.S. Nimitz'
    policy on sexual harassment mirrors the Navy's policy—namely, that if a sailor
    believes he or she is being sexually harassed, "it is in the eye of the beholder."
    (*Id.*)

11. Mr. Loehndorf testified multiple times that Ms. Williams was "entitled to" her
    belief that Mr. Loehndorf sexually harassed her and that, assuming this belief
    was genuine, she had a duty to report Mr. Loehndorf's actions to her
    commanding officers. (*Id.* at 90.) He also testified that Ms. Williams' beliefs
    did not have to be substantiated or corroborated before she had a duty to report
    them to her commanding officers, only that she needed to genuinely hold those
    beliefs. (*Id.* at 91.) He further testified that if the acts alleged by Ms. Williams
    did in fact occur, she would be justified in perceiving sexual harassment (*id.* at
    93), and that Ms. Williams "could have" perceived some of his interactions
    with her as sexual harassment. (*Id.* at 96-97.)

**D.    Findings Based on Documentary Evidence**

1. There were two command investigations into Mr. Loehndorf's conduct. In the
   first, Lieutenant Jason Scarborough found that Mr. Leohndorf was a
   "touchy/feely" guy who never had any malicious or sexual intent toward Ms.
   Williams. (Quinn Decl. (Dkt. # 24) Ex. 6 at 3-4.) Mr. Scarborough concluded

1  that evidence of touching and other behavior was equivocal and that Mr.
   Loehndorf should receive formal written counseling for his behavior.  (*Id.* at
2  4.)  In the second command investigation, Lieutenant Commander Ryan
   Anderson found that Mr. Loehndorf attempted to put his head on Ms.
3  Williams' shoulder and said he wanted to "smack [her] ass," that Mr.
   Loehndorf called Ms. Williams on the phone by mistake and told her it was
4  "good to hear [her] voice," that Mr. Loehndorf said Ms. Williams "could have
   perceived some of his interaction with her as sexual harassment but that was
5  not his intent," that Mr. Loehndorf "is either not being truthful or possesses a
   selective memory in relation to the number of times that he has touched [Ms.]
6  Williams . . . [and] whether he has made a lewd or sexual suggestive comment
   to [Ms.] Williams," and that "[Ms.] Williams' claims constitute sexual
7  harassment."  (*Id.* Ex. 10 at 1-18.)

8  2.  On January 28, 2013, the commanding officer of the U.S.S. Nimitz, J.S. Ruth,
       issued a non-punitive letter of caution to Mr. Loehndorf adopting many of the
9      findings of the second command investigation.  (*Id.* Ex. 12.)

10 3.  On February 5, 2013, Mr. Loehndorf was the subject of a non-judicial
       punishment proceeding called a "captain's mast."  (Supp. Ruth Decl. (Dkt.
11     # 19-2) at 4-5.)  At that proceeding, Mr. Leohndorf pled guilty to two charges
       related to the alleged sexual harassment of Ms. Williams.  (*Id.*)

12 4.  On February 8, 2013, Mr. Ruth, issued a punitive letter of reprimand against
       Mr. Leohndorf.  (Ruth Decl. (Dkt. # 14).)  In that letter, Mr. Ruth concludes
13     that (1) Mr. Loehndorf attempted to rest his head on Ms. Williams' shoulder
       and told her he wanted to "smack her ass" (*id.* at 5); (2) on numerous
14     occasions, Mr. Loehndorf touched Ms. Williams in ways that Mr. Loehndorf
       knew were unwelcome (*id.* at 4-5); (3) Mr. Loehndorf told Ms. Williams on the
15     phone that, even though he had called a wrong number, it was "good to hear
       [her] voice" (*id.* at 5); and (4) Mr. Loehndorf violated an order not to enter
16     damage control spaces when Ms. Williams was present (*id.*).  Mr. Ruth
       subsequently requested that Mr. Loehndorf be detached from the U.S.S. Nimitz
17     for cause.  (Quinn Decl. Ex. 14.)

18 5.  Mr. Loehndorf has appealed his non-judicial punishment several times, but to
       date none of his appeals have been successful.  (*See, e.g.*, Supp Ruth Decl. at
19     11-26; Quinn Decl. Ex. 16; Goeller Decl. Ex. 1.)

20 6.  Mr. Loehndorf at one point said that he was "sincerely remorseful" for his
       actions, explaining that "What I meant by that statement was that I was sorry
21     that [Ms.] Williams felt uncomfortable around me as evidenced by the one
       time I touched her during RIMPAC when she pulled away."  (Quinn Decl. Ex.
22     8 at 2.)  This demonstrates that, at least at one point in time, Mr. Loehndorf

1   acknowledged that some of his actions made Ms. Williams feel uncomfortable.

2   **E.   Application of Law to Facts**

3   The question before the court is whether Ms. Williams was acting within the scope

4   of her employment when she reported allegations of sexual harassment by Mr. Loehndorf

5   to her superiors.  "Under Washington law, an employee acts within the scope of h[er]

6   employment . . . when [s]he is 'engaged in the performance of the duties required of [her]

7   by [her] contract of employment' or when 'he [is] engaged at the time in the furtherance

8   of the employer's interest.'"  *Pauly*, 348 F.3d at 1150-51.  It is not disputed in this case

9   that if Ms. Williams felt she was being sexually harassed by Mr. Loehndorf, she had a

10   duty to report Mr. Loehndorf's conduct to her superiors:  Article 1137 of the U.S. Navy

11   Regulations requires her to report to a superior immediately upon learning of behavior

12   constituting sexual harassment.  (*See* Ruth Decl. at 12.)

13   Mr. Ruth, the U.S.S. Nimitz' commanding officer, provided a summary of the

14   definition of sexual harassment in effect on the U.S.S. Nimitz:

15   > Sexual harassment has three elements, more specifically that:  (1) the
16   > behavior is unwelcome; (2) the behavior is sexual in nature; (3) the
      > behavior must occur in, or impact on, the work environment.  In other
17   > words, sexual harassment can be unwelcome verbal or physical conduct of
      > a sexual nature which has the purpose or effect of unreasonably interfering
18   > with an individual's work performance or otherwise creating an
      > intimidating, hostile or offensive working environment.  The verbal or
19   > physical conduct, to be actionable, need only be so severe or pervasive that
      > a reasonable person would perceive, and the victim does perceive, the work
      > environment as hostile or offensive.

20   (Quinn Decl. Ex. 12 at 2.)  The definition makes clear that sexual harassment is, as Mr.

21   Loehndorf concedes (Ev. Hearing Tr. at 89), "in the eye of the beholder":

22

1
2
3
4
5

> Unwelcome behavior is behavior that a person does not ask for and which that person considers undesirable or offensive.  Not everyone has the same perception of "undesirable or offensive."  Since the person being subjected to the behavior, the recipient, is the one being affected, it is the recipient's perception that controls.  Using a "reasonable person standard," from the perspective of the recipient, is considered a common sense approach in determining which behaviors might be considered sexual harassment.  In this regard, behavior which the recipient reasonably finds unwelcome should be stopped.

6   (Quinn Decl. Ex. 12 at 3.)  If Ms. Williams believed that Mr. Loehndorf's conduct met

7   this standard, she had a duty to report his behavior to her superiors and was therefore

8   acting within the scope of her employment when she did so.  *Pauly*, 348 F.3d at 1150-51;

9   (*see* Ruth Decl. at 12.)

10          The court finds that Mr. Loehndorf has not proved the contrary.  The court has

11  considered all of the evidence submitted in this case and has conducted an evidentiary

12  hearing.  Having done all of this, and relying not only on the findings detailed above but

13  on the entire record in this case, the court concludes that Mr. Loehndorf has not met his

14  burden of proving that Ms. Williams acted outside the scope of her employment.  In

15  doing so, the court does not find that Mr. Loehndorf's behavior did or did not amount to

16  sexual harassment.  Nor does the court find, specifically, that Ms. Williams did or did not

17  fabricate her sexual harassment allegations.  These are not the precise questions before

18  the court.  Rather, the court concludes that based on the evidence in the record, Mr.

19  Loehndorf has not met his burden of proving that Ms. Williams fabricated her sexual

20  harassment allegations or otherwise acted outside the scope of her employment.

21          This finding is sufficient to sustain the substitution of the United States as the sole

22  party defendant in this case.  *See* 28 U.S.C. § 2679(d)(1); *Pauly*, 348 F.3d at 1150-51.  It

1   is also sufficient to dismiss the case since Mr. Loehndorf concedes that dismissal is

2   appropriate if the United States is the sole party defendant.  (*See* Resp. to Mot to Dismiss

3   (Dkt. # 18).)  Accordingly, this case is dismissed with prejudice.

4                              **III.    CONCLUSION**

5          For the reasons described above, the court DENIES Mr. Loehndorf's motion

6   challenging substitution (Dkt. # 9) and GRANTS the United States' motion to dismiss

7   (Dkt. # 13).  This case is dismissed with prejudice.

8          Dated this 30th day of July, 2014.

9

10

11                                          _____

12                                          JAMES L. ROBART
                                            United States District Judge

13

14

15

16

17

18

19

20

21

22

ORDER- 14